IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Rogelio Smith (R-52162), | ) |
| Plaintiff, | ) |
| v. | ) Case No. 16 C 3437 |
| Wexford Health Sources, Inc., et al., | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Plaintiff Rogelio Smith, an Illinois prisoner, brought this action *pro se* pursuant to 42 U.S.C. § 1983, alleging that Wexford Health Sources, Inc., (the entity that furnishes medical care at Illinois prisons), Dr. Saleh Obaisi, and Dr. Jason Dunn provided purportedly deficient medical care for Plaintiff's deteriorating vision. Before the Court are Defendants Dr. Obaisi and Wexford's motion for summary judgment and Defendant Dr. Jason Dunn's motion for summary judgment. For the reasons set forth below, the Court grants Defendants' summary judgment motions in their entirety.

## BACKGROUND

Local Rule 56.1 sets out a procedure for presenting facts pertinent to a party's request for summary judgment pursuant to Fed. R. Civ. P. 56. Specifically, Local Rule 56.1(a)(3) requires the moving party to submit "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to judgment as a matter of law." *Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014). Each paragraph of the movant's statement of facts must include "specific references to the affidavits, parts of the record, and other supporting

materials relied upon to support the facts set forth in that paragraph." L.R. 56.1(a). The opposing party must file a response to each numbered paragraph in the moving party's statement, "including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." L.R. 56.1(b)(3)(B). "All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." L.R. 56.1(b)(3)(C). The nonmoving party may also present a separate statement of additional facts "consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon." L.R. 56.1(b)(3)(C).

"[A] district court is entitled to decide [a summary judgment] motion based on the factual record outlined in the [Local Rule 56.1] statements." *Koszola v. Bd. of Educ. of Chi.*, 385 F.3d 1104, 1109 (7th Cir. 2004) (third alteration in original) (internal quotation marks omitted); *Stevo v. Frasor*, 662 F.3d 880, 886-87 (7th Cir. 2011) ("Because of the high volume of summary judgment motions and the benefits of clear presentation of relevant evidence and law, we have repeatedly held that district judges are entitled to insist on strict compliance with local rules designed to promote the clarity of summary judgment filings."). Plaintiff's status as a *pro se* litigant does not excuse him from complying with Local Rule 56.1. *See McNeil v. United States*, 508 U.S. 106, 113 (1993) ("[W]e have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Coleman v. Goodwill Indus. of Se. Wis., Inc.*, 423 Fed. Appx. 642, 643 (7th Cir. 2011) ("Though courts are solicitous of pro se litigants, they may nonetheless require strict compliance with local rules.").

Because Plaintiff is proceeding *pro se*, each Defendant served him with a "Notice to *Pro Se* Litigant Opposing Motion for Summary Judgment" as required by Local Rule 56.2. (Dkt. 83 and 84.) The notices explained how to respond to Defendants' summary judgment motions and Rule 56.1 Statements and cautioned Plaintiff that the Court would deem Defendants' factual contentions admitted if he failed to follow the procedures delineated in Local Rule 56.1. (*Id*. at 2.)

Plaintiff failed to respond to Defendants' undisputed facts. Instead, Plaintiff submitted a motion consisting of three affidavits, containing no reference to the record. (Dkt. 91.) Plaintiff's response, while written in Spanish, was translated by Defendants and submitted to the Court with a declaration of accuracy, signed by the interpreter. (*Id*. at p. 1.) The Court thus considers Defendants' statements of fact to which Plaintiff did not properly respond, as admitted. Although Plaintiff's facts (affidavits) were not submitted in accordance with the Court's local rules and need not be considered, Plaintiff may be able to testify about some of those facts and the Court acknowledges that he is proceeding *pro se*. To the extent Plaintiff's facts are supported by the record, the Court may consider them. *Modrowski v. Pigatto*, 712 F.3d 1166, 1169 (7th Cir. 2013) (the court has discretion as to how to enforce its local rules, so long as it does so fairly and equally between the parties). With these guidelines in mind, the following facts are undisputed.

## BACKGROUND

Plaintiff, Rogelio Smith ("Plaintiff" or "Smith") has been incarcerated at Stateville Correctional Center ("Stateville") since 2006. (Dkt. 65, OWSOF[1], ¶ 1.) Defendant, Saleh Obaisi, M.D. ("Dr. Obaisi"), deceased, was a physician licensed to practice medicine in the State of Illinois who served as the Medical Director of Stateville during the relevant time period. (*Id*. at ¶ 2.)

---

[1] Obaisi and Wexford's Statement of Facts.

Defendant, Wexford Health Sources, Inc. ("Wexford"), is a private corporation that has contracted with the IDOC to provide medical services to inmates at various correctional facilities, including Stateville. (*Id*. at ¶ 3.)

Defendant Jason Dunn, O.D. is licensed to practice optometry in the State of Illinois. (Dkt. 68, DSOF[2], ¶ 4.) Dr. Dunn provided optometric services to inmates at Stateville from November of 2011 through November of 2014. (*Id.*) Dr. Dunn saw Plaintiff on May 7, 2014, when Plaintiff broke his glasses. (*Id*. at ¶ 11, and Dkt. 97-1, Pl. transcribed resp. p. 3.) At that time, Dr. Dunn provided Plaintiff with a pair of replacement glasses during his visit. (*Id*. at ¶ 12, and *Id.*)

On July 11, 2014, Plaintiff was involved in an altercation with his cellmate at Stateville while he was preparing to undergo dialysis treatment. (Dkt. 65, OWSOF, at ¶ 5.) After the assault, Plaintiff was transported to the Health Care Unit and treated by Virginia Garcia, RN who noted that Plaintiff had "a ½ inch laceration and contusion above his left eyebrow," as well as a "1/2 [inch] laceration between his eyes" and "2 abrasions to his left upper eyelid." (*Id*.) Nurse Garcia treated Plaintiff's wounds and instructed him to follow up during Urgent Care Sick Call. (*Id*.) On July 28, 2014, Plaintiff had an appointment with Dr. Obaisi in connection with, among other things, blurred vision that reportedly had begun after the July 11th altercation. (*Id*. at ¶ 6.) After examining Plaintiff, Dr. Obaisi noted that there were no acute findings. (*Id*.) Nonetheless, Dr. Obaisi still referred Plaintiff to the eye clinic at Stateville for an evaluation by an optometrist. (*Id.*)

The next day, on July 29, 2014, Plaintiff reported to RN Sick Call that he was seeing "dark spots." (*Id*. at ¶ 7.) In response to Plaintiff's complaints, the on-call nurse noted that Plaintiff had seen Dr. Obaisi on the previous day for his complaints of blurred vision and that Dr. Obaisi had

---

[2] Dunn's Statement of Facts.

4

referred Plaintiff to the eye doctor on-site. (*Id*.) In light of the foregoing, the nurse reminded Plaintiff of his pending referral and instructed Plaintiff to notify medical providers at Stateville if he is not seen by the eye doctor or if his symptoms worsen. (*Id*.)

On September 5, 2014, Plaintiff had an optometry examination with Dr. Dunn in connection with vision complaints. (*Id*. at ¶ 8, Dkt. 68, DSOF, ¶¶ 17-18, and Dkt. 97-1, at pp. 3-4.) Upon examination, Dr. Dunn noted that Plaintiff had a cataract in his left eye but opined that the cataract was not a traumatic cataract as Plaintiff's vision was abnormal in both of his eyes. (*Id*. at ¶ 8, and ¶¶ 29-30.) Further, Dr. Dunn noted that Plaintiff self-reported that his vision was fine until he was attacked on July 11, 2014. (*Id*. at ¶ 8, and ¶ 28.) In response to Plaintiff's complaints, Dr. Dunn provided Plaintiff with glasses, "Solar-Rolz" and recommended that Plaintiff return for a follow-up consultation in six months. (*Id*. at ¶ 8, and ¶¶ 18, 33, and Dkt. 97-1, at pp. 3-4.) Moreover, Dr. Dunn noted that Plaintiff's Snellen bilateral visual acuity was better than 20/40. (*Id*. at ¶ 8, and ¶ 26.)

Although Plaintiff was not scheduled for a full exam and Dr. Dunn did not have Plaintiff's prior optometric records to review, Dr. Dunn examined Plaintiff's eyes based on Plaintiff's report that he was having vision issues. (Dkt. 68, DSOF, ¶¶ 20-23.) At the time of the examination, Dr. Dunn did not think Plaintiff's vision issues were traumatic because Plaintiff reported only being hit in one eye. (*Id*. at ¶ 30.) Dr. Dunn noted that Plaintiff's vision was reduced in both eyes due to cataracts. (*Id*. at ¶ 29.) Plaintiff did not report having difficulty with activities of daily living, and Dr. Dunn scheduled Plaintiff for a follow-up appointment in six months. (*Id*. at ¶¶ 32-33.) Dr. Dunn considered the effect on activities of daily living in determining whether to recommend an ophthalmology consultation for cataracts and if he felt the condition was compromising the person's

ability to accomplish daily tasks safely he would recommend such a referral. (*Id*. at ¶¶ 44-45.) In treating Plaintiff, Dr. Dunn applied the same standard he would have used in the private sector for determining whether to recommend an ophthalmology consultation for Plaintiff's cataracts. (*Id*. at ¶ 41.)

On January 15, 2015, Dr. Obaisi evaluated Plaintiff in connection with complaints that the vision in his left eye was impaired. (Dkt. 65, OWSOF, ¶ 9.) On this occasion, Dr. Obaisi referred Plaintiff to an off-site ophthalmologist. (*Id*.) On February 7, 2015, Dr. Obaisi conducted a physical examination of Plaintiff. (*Id*. at ¶ 10.) At that time, Dr. Obaisi referred Plaintiff to the eye clinic at Stateville for an evaluation. (*Id*.) On March 12, 2015, Plaintiff reported concerns to Dr. Obaisi about his left-eye cataract. (*Id*. at ¶ 11.) In response, Dr. Obaisi provided Plaintiff with a second referral to the see the optometrist at Stateville. (*Id*.)

On April 10, 2015, Plaintiff went to the Stateville Optometric Clinic for an optometry evaluation by George Nista, O.D. ("Dr. Nista"). (*Id*. at ¶ 12.) Upon examination, Dr. Nista noted that Plaintiff's corrected visual acuity was 20/40 in his right eye but did not evaluate Plaintiff's left eye. (*Id*.) Dr. Nista also recommended that Plaintiff be referred for an evaluation to discuss extracting the cataract from his left eye. (*Id*.) Moreover, Dr. Nista noted that Plaintiff exhibited signs of glaucoma suspect in his left eye and prescribed him Latanoprost eye drops, which is a medication designed to treat high pressure within the eye due to glaucoma. (*Id*.)

On June 24, 2015, at the direction and approval of Dr. Obaisi and Wexford, Plaintiff went to the University of Illinois at Chicago Medical Center ("UIC") for an ophthalmology evaluation with Dr. Abed Namauari. (*Id*. at ¶ 13, and Dkt. 97-1, p. 5.) After performing a physical examination of Plaintiff, Dr. Namauari noted that Plaintiff had a "traumatic zonular dehiscence and crystalline lens

6

subluxation [in his] left eye" as well as "glaucoma [in his] left eye." (Dkt. 65, OWSOF, ¶ 13) Dr. Namauari also indicated that Plaintiff exhibited signs of "macular changes" in his right eye as well as a cataract that should simply be "observed for now." (*Id*.) The doctor noted that Plaintiff, exhibited "better vision out of his right eye." (*Id*.) As a means to treat the glaucoma in Plaintiff's left eye, Dr. Namauari instructed Plaintiff to continue using Latanoprost eye drops and prescribed Plaintiff with Cosopt eye drops. (*Id*.) Further, Dr. Namauari recommended that Plaintiff return to the clinic in one month for a follow-up examination relative to the macular changes in his right eye. (*Id*.) On July 6, 2015, Dr. Obaisi saw Plaintiff after his appointment with Dr. Namauari. (*Id*. at ¶ 14.) At that time, Dr. Obaisi informed Plaintiff that he was approved by Wexford for a follow-up exam at UIC as well as noted that Plaintiff exhibited "no changes" in his condition. (*Id*.)

On October 15, 2015, at the direction and approval of Dr. Obaisi and Wexford, Plaintiff had a follow-up ophthalmology evaluation at UIC with Dr. Eric Feinstein. (*Id*. at ¶ 15.) At that time, Dr. Feinstein noted that Plaintiff's "IOP [was] much improved today OS" and that Plaintiff should "continue gtts (Timolol/Dorzolamide) – good pressure reduction." (*Id*.) Also, Dr. Feinstein recommended that Plaintiff "return to clinic for IOP check 1 month" as the cataract in Plaintiff's left eye should simply be "monitor[ed] for now." (*Id*.) Later on that day, after he had returned to Stateville, Plaintiff saw Lydia Lewondowska, RN for a post medical writ appointment. (*Id*. at ¶ 16.) At that time, Plaintiff informed Nurse Lewondowska that he had no complaints of pain. (*Id*.) Additionally, Nurse Lewondowska noted that Plaintiff did not exhibit any signs or symptoms of acute distress. (*Id*.)

On November 12, 2015, UIC canceled Plaintiff's appointment in the Ophthalmology Clinic at UIC and rescheduled it for January 5, 2016. (*Id*. at ¶ 17.) On January 5, 2016, at the direction

and approval of Dr. Obaisi and Wexford, Plaintiff attended a follow-up ophthalmology evaluation with Dr. Abed Namauari. (*Id.* at ¶ 18.)  Dr. Namauari noted that Plaintiff exhibited "good IOP control OS." (*Id.*)  In addition, Dr. Namauari recommended that Plaintiff receive an "apt [with] retina clinic Dr. Liederman 1-2m for cataract extraction" as well as "cont. Xalatan gtts and Cosopt BID os." (*Id.*)  On January 11, 2016, just six days later, Plaintiff had a follow-up visit with Dr. Obaisi. (*Id.* at ¶ 19.)  During this consultation, Dr. Obaisi noted that Plaintiff had a "referral to UIC retina clinic in 2 months." (*Id.*)  Also, Dr. Obaisi noted that Plaintiff had "no complaints" on this occasion. (*Id.*)

On February 8, 2016, Plaintiff saw Dr. Nista for an optometry examination in connection with his complaints of blurred vision.  (*Id.* at ¶ 20.)  At that time, Plaintiff refused to allow Dr. Nista to evaluate his vision.  (*Id.*)  In light of Plaintiff's refusal, Dr. Nista recommended that Plaintiff return to the Optometric Clinic after his pending cataract evaluation at UIC.  (*Id.*)  Further, on February 8, 2016, Plaintiff received "Solar-Rolz," which is a plastic covering that fits over Plaintiff's glasses to help shield his eyes from the sun.  (*Id.* at ¶ 21.)

On June 7, 2016, at the direction and approval of Dr. Obaisi and Wexford, Plaintiff had a retina evaluation at UIC with Randee Miller Watson, M.D., a retina specialist, who noted "c/o poor VA OS since trauma to OS approximately 2 years ago." (*Id.* at ¶ 22.)  Upon physical examination, Dr. Watson noted, among other things, that Plaintiff had a "traumatic cataract OS with subluxed lens." (*Id.*)  As such, Dr. Watson recommended a "pars plana lensectomy, vitrectomy, scleral fixated IOL with Dr. Leiderman…." (*Id.*)  As to Plaintiff's right eye, Dr. Watson noted that her exam revealed a lamellar macular hole which was "asymptomatic" and need only be "observe[d] for now." (*Id.*)  Additionally, Dr. Watson noted the presence of a cataract in Plaintiff's right eye but

recommended that Plaintiff simply follow up with the general eye clinic. (*Id*.) On June 15, 2016, Plaintiff presented for a follow-up visit with Dr. Obaisi. (*Id*. at ¶ 23.) During this visit, Dr. Obaisi noted that Plaintiff exhibit no objective signs of a change in his condition and instructed Plaintiff to follow up on an as needed basis. (*Id*.)

On September 21, 2016, at the direction and approval of Dr. Obaisi and Wexford, Plaintiff saw Dr. Yannek Leiderman at UIC and underwent a "pars plana vitrectomy with focal endolaser" procedure as well as a "pars plana lensectomy with implantation of intraocular lens" procedure in his left eye. (*Id*. at ¶ 24.) On September 25, 2016, Plaintiff had a post medical writ appointment with Dr. Obaisi, and at that time, Dr. Obaisi provided Plaintiff with a renewed permit for daily medical showers. (*Id*. at ¶ 25.)

Upon returning to Stateville, optometrists continued to monitor Plaintiff's vision condition. (*Id*. at ¶ 26.) On November 30, 2016, Plaintiff had a follow-up optometry appointment with Timothy Fahy, O.D. ("Dr. Fahy"). (*Id*.) On this occasion, Dr. Fahy noted that Plaintiff's corrected visual acuity in his left eye was 20/30 and 20/50 in his right eye. (*Id*.) Furthermore, Dr. Fahy recommended that Plaintiff return to the clinic in six months for a follow up appointment. (*Id*.) On May 24, 2017, Plaintiff had a follow-up optometry appointment with Dr. Fahy. (*Id*. at ¶ 27.) At that time, Dr. Fahy noted that Plaintiff presented with "age-related macular degeneration" changes in his right eye and provided Plaintiff with a non-urgent referral to see a retina specialist at UIC. (*Id*.)

Plaintiff stated in his deposition that when being exposed to the sun, it bothered him, and he had something that covers that left lens. (*Id*. at ¶ 29.) Plaintiff acknowledged that he can read and write, as well as navigate the prison hallways when he uses his glasses. (*Id*. at ¶ 30.) Also, Plaintiff

acknowledged that he is unaware of any other eye surgery that has been prescribed to him that he has not received. (*Id*. at ¶ 31.) Further, Plaintiff admitted that prior to June 24, 2015, no one had ever told him that he had glaucoma in his left eye. (*Id*. at ¶ 37.) In addition, Plaintiff stated that June 24, 2015, was the first day that he was diagnosed with glaucoma and that he was provided with two medications. (*Id*.) Plaintiff testified in his deposition that while he feels that he received the wrong treatment at Stateville, he was given the correct treatment at UIC. (*Id*. at ¶ 39.) Plaintiff has never received any formal medical training. (*Id*. at ¶ 40.) Moreover, Plaintiff acknowledged in his deposition that he named Wexford as a Defendant in this case because it employs Dr. Obaisi. (*Id*. at ¶ 33.)

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986). After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 255 (quotation omitted). If the non-moving party "'fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,' summary judgment must be granted." *Blow v. Bijora, Inc.*, 855 F.3d 793, 797-98 (7th Cir. 2017) (citation omitted).

## ANALYSIS

I.  **Eighth Amendment Medical Care Claim**

The Court begins by examining whether Plaintiff has presented evidence – viewed in his favor – that creates a genuine issue of material fact that Stateville medical personnel provided constitutionally deficient medical care for his eye conditions. The Eighth Amendment right to be free from cruel and unusual punishment prohibits state officials and medical personnel from acting with deliberate indifference to an inmate's serious medical needs. *Conley v. Birch*, 796 F.3d 742, 746 (7th Cir. 2015) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)); *see also Petties v. Carter*, 836 F.3d 722, 727 (7th Cir. 2016) (en banc). Eighth Amendment medical care claims contain both an objective and a subjective component, namely, the inmate must have an objectively serious medical condition and the defendant must be subjectively aware of and consciously disregard the inmate's serious medical need. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

    A.  **Objective Element—Serious Medical Condition**

The parties agree that the medical conditions at issue here are cataracts and glaucoma. Courts have determined that the conditions complained of by Plaintiff constitute objectively serious medical conditions. *See O'Banner v. Bizzell*, 151 F.3d 1033, [published in full-text format at 1998 U.S. App. LEXIS 17685] (7th Cir. 1998) (glaucoma "is manifestly a sufficiently serious medical condition to satisfy the objective element of the deliberate indifference standard.") (unpublished); *Talley v. Dart*, No. 08 C 5485, 2012 U.S. Dist. LEXIS 68089, 2012 WL 1899393, at *6 (N.D. Ill.

May 24, 2012) (same); *see also Stewart v. Wexford Health Sources, Inc.*, No. 15-CV-1322-MJR, 2016 U.S. Dist. LEXIS 121, 2016 WL 37334, at *4 (S.D. Ill. Jan. 4, 2016) (temporary loss of eyesight objectively serious medical condition); *Flemming v. Els*, No. 3:15-CV-00263-JPG, 2015 U.S. Dist. LEXIS 60056, 2015 WL 2194518, at *2 (S.D. Ill. May 7, 2015) (chronic eye conditions objectively serious medical condition). Accordingly, Plaintiff's various eye ailments qualify as serious medical conditions under the objective element of his constitutional claim.

### B. Subjective Element—Deliberate Indifference

For the subjective element, Plaintiff must show that medical personnel acted with deliberate indifference to his serious medical needs. *Estelle*, 429 U.S. at 105. Deliberate indifference is comparable to criminal recklessness. *Farmer*, 511 U.S. at 837. The official accordingly must both "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Id*. "The requirement of subjective awareness stems from the Eighth Amendment's prohibition of cruel and unusual *punishment*; 'an *inadvertent* failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain.'" *Zaya v. Sood*, 836 F.3d 800, 804–05 (7th Cir. 2016) (emphases in original) (quoting *Estelle*, 429 U.S. at 105).

Claims of negligence (even gross negligence), medical malpractice, or a patient's disagreement with a prescribed course of treatment are insufficient to meet this standard. *See Cesal v. Moats*, 851 F.3d 714, 724 (7th Cir. 2017) ("Deliberate indifference requires more than evidence of negligence or medical malpractice.") (citations omitted); *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012); *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012). "To survive summary judgment," an inmate "need[s] to present evidence sufficient to show that [a

medical professional's] decision was 'so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment.'" *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 664 (7th Cir. 2016) (citation omitted).

Viewing the evidence and all reasonable inferences in Plaintiff's favor – as the Court is required to do at this procedural posture – based on the extensive record reflecting the care that Stateville medical staff provided Plaintiff for his vision issues, Plaintiff has failed to establish a material issue of fact that Dr. Obaisi or Dr. Dunn were deliberately indifferent to his serious medical needs. To clarify, during the relevant time period, Dr. Obaisi evaluated and/or treated Plaintiff, and three different optometrists, including Dr. Dunn, evaluated and/or treated Plaintiff on five separate occasions. These doctors referred Plaintiff to UIC to see ophthalmologists on three occasions, and a retina specialist at UIC on two occasions. Plaintiff underwent a surgical extraction of the cataract in his left eye and received medications, including medicated eye drops for treatment of his glaucoma. Also, Plaintiff was also given prescription eyeglasses as well as "Solar-Rolz" to help with his sensitivity to sunlight.

With respect to Dr. Dunn, Plaintiff saw him on two occasions. On the first occasion, Plaintiff reported breaking his glasses, and Dr. Dunn provide Plaintiff with replacement glasses. At the second visit, although Plaintiff was not scheduled for a full examination, Dr. Dunn examined Plaintiff, determined that his eye issues were not impacting the activities of Plaintiff's daily life, and scheduled him for a six-month, follow-up appointment. In his care of Plaintiff, Dr. Dunn employed the same standards he uses in the private sector in determining whether to recommend Plaintiff for an ophthalmology consultation. Having seen and treated Plaintiff on September 5, 2014, and

scheduling a follow-up appointment for Plaintiff six months later, Dr. Dunn left his position of employment at Stateville in November 2014.

Plaintiff, in his response to the motions for summary judgment, seems to suggest that his eye-care treatment could have been faster, or that he somehow suffered from a delay in care. Examining the record and all reasonable inferences in Plaintiff's favor, his cataracts and macula conditions for most of his visits had not progressed beyond the observation level, and Stateville medical staff examined him regularly. Once his cataracts required surgery, Defendants took the necessary steps toward obtaining surgery for him. As for Plaintiff's glaucoma, he received drops for eye pressure on the same day as his diagnosis, and then throughout the relevant time period. Because Plaintiff received continuous and extensive medical treatment over the twenty-seven months in question, he has failed to establish a material issue of fact regarding his Eighth Amendment medical care claim. Accordingly, the Court grants summary judgment in favor of Drs. Dunn and Obaisi.

## II. Monell Claim

A private corporation that has contracted to provide essential government services, such as Defendant Wexford, may be liable under § 1983 if an inmate's constitutional violation during the provision of such services was caused by an unconstitutional policy, custom, or practice of the corporation itself. *Chatham v. Davis*, 839 F.3d 679, 685 (7th Cir. 2016) (*Monell* liability "applies in § 1983 claims brought against private companies acting under color of state law"); *see also Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658 (1978). To recover under *Monell*, Plaintiff must offer evidence creating a genuine issue of material fact showing that (1) he suffered a deprivation of a constitutional right; (2) as a result of an express policy, widespread custom, or

deliberate act of a decision-maker with final policy-making authority, that was; (3) the moving force behind his constitutional injury. *See Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017); *Estate of Perry v. Wenzel*, 872 F.3d 439, 461 (7th Cir. 2017).

After careful review of the record, Plaintiff has failed to present any evidence that he suffered a constitutional deprivation, let alone that Wexford has a practice, policy, or custom that was the moving force behind any such constitutional deprivation. *See Daniel v. Cook Cnty.*, 833 F.3d 728, 734 (7th Cir. 2016) ("We have said in general terms that an inmate can meet this burden by offering 'competent evidence tending to show a general pattern of repeated behavior (i.e., something greater than a mere isolated event'")) (citation omitted). Further, there is no evidence in the record that a deliberate act of a decision-maker with final policy-making authority was behind any such constitutional injury. Indeed, Plaintiff admitted at his deposition that he named Wexford as a Defendant because it employed Dr. Obaisi during the relevant time period. Accordingly, Plaintiff has failed to set forth sufficient evidence – viewed in his favor – that raises a genuine issue of material fact as to the essential elements of his *Monell* claim. *See Blow,* 855 F.3d at 797-98. The Court therefore grants Defendant Wexford's summary judgment motion.

**III.     Plaintiff's Motion for Attorney Representation and Supporting Materials**

Plaintiff moved for assistance of counsel (Dkt. 89) and submitted two additional motions supporting his request for assistance of counsel (Dkt. 90 and 91.) The Court recruited counsel for Plaintiff on April 19, 2016, and counsel ably and diligently represented Plaintiff until he was granted leave to withdraw on December 6, 2017. Counsel represented Plaintiff throughout discovery, and the filing of the motions for summary judgment and withdrew only after a substantial disagreement in litigation strategy developed, after which Plaintiff filed a motion in

which he accused counsel of engaging in "psychological intimidation" to protect Plaintiff's interests. (Dkt. 78).

"There is no right to court-appointed counsel in federal civil litigation," *Olson v. Morgan*, 750 F.3d 708, 711 (7th Cir. 2014), and the Court has discretion to request that an attorney represent an indigent litigant on a volunteer basis under 28 U.S.C. § 1915(e)(1). In making the decision whether to recruit counsel, the Court must engage in a two-step analysis: (1) has the plaintiff made a reasonable attempt to obtain counsel on his own behalf or been effectively precluded from doing so; and, if so, (2) given the factual and legal complexity of the case, does this particular plaintiff appear competent to litigate the matter himself. *Pruitt v. Mote*, 503 F.3d 647, 654-55 (7th Cir. 2007) (en banc). This analysis does not focus solely on a plaintiff's ability to try the case, but on his ability to gather evidence and prepare and respond to motions. *Navejar v. Iyiola*, 718 F.3d 692, 696 (7th Cir. 2013).

The Court acknowledges that Plaintiff's claim of deliberate indifference to a serious medical condition "is an issue that requires the 'subtle appreciation of legal causation and of the duties imposed upon state prison officials by the Eighth Amendment.'" *Perez v. Fenoglio*, 792 F.3d 768, 784 (7th Cir. 2015) (citation omitted). Also, "[t]aking depositions, conducting witness examinations, applying the rules of evidence, and making opening statements are [often] beyond the ability of most pro se litigants to successfully carry out." *Miller v. Campanella*, 794 F.3d 878, 880 (7th Cir. 2015). As discussed, however, Plaintiff had the benefit of counsel for the entirety of discovery, and the undisputed facts in the record indicate that the totality of the care Defendants provided Plaintiff was constitutionally adequate, consequently attorney assistance is not required. *See Dobbey v. Miller*, 2018 U.S. App. LEXIS 8614, **11-12 (7th Cir. April 5, 2018).

Further, the Court acknowledges that, according to Plaintiff, one of the reasons he was seeking recruitment of another attorney was his inability to sufficiently understand English to proceed on his own. The Court conducted a hearing on this issue on February 1, 2018, at which time Plaintiff's prior counsel reported to the Court that during their attorney-client relationship, he communicated with Plaintiff, both verbally and in writing, in English. (Dkt. 102.) Moreover, counsel reported that while there was a translator at Plaintiff's deposition, it was out of an abundance of caution to ensure Plaintiff understood all of the questions, and that in many instances, Plaintiff began to respond to the questions asked before translation was made. (*Id.*) The Court further notes that Plaintiff has filed motions in English, including the motion accusing his prior counsel of "psychological intimidation." (Dkt. 78.)

Accordingly, because Plaintiff had benefit of counsel throughout the discovery process, proved himself unable to work with recruited counsel, and has proven himself able to sufficiently understand English to proceed on his own, in conjunction with the undisputed record establishing the constitutional adequacy of the medical care provided to him by Defendants, his motion for attorney assistance (Dkt. 89) and supporting motions (Dkt. 90 and 91) are denied.

**CONCLUSION**

The Court grants Defendants' motions for summary judgment. [63, 66.] The Court denies Plaintiff's motion for attorney representation [89] and supporting motions [90] and [91]. Last, the Court denies Plaintiff's motion to verify a document [78] as moot.

If Plaintiff wishes to appeal, he must file a notice of appeal with this Court within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). If Plaintiff appeals, he will be liable for the $505.00 appellate filing fee regardless of the appeal's outcome. If the appeal is found to be non-

meritorious, Plaintiff could be assessed a "strike" under 28 U.S.C. § 1915(g). If a prisoner accumulates three "strikes" because three federal cases or appeals have been dismissed as frivolous or malicious, or for failure to state a claim, the prisoner may not file suit in federal court without pre-paying the filing fee unless he is in imminent danger of serious physical injury. If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* in this Court. *See* Fed. R. App. P. 24(a)(1).

Plaintiff need not bring a motion to reconsider this Court's ruling to preserve his appellate rights. If Plaintiff wishes the Court to reconsider its judgment, he may file a motion under Rules 59(e) or 60(b). Any Rule 59(e) motion must be filed within 28 days of the entry of this judgment and the time to file a motion pursuant to Rule 59(e) cannot be extended. *See* Fed. R. Civ. P. 6(b)(2), 59(e). A timely Rule 59(e) motion suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon. *See* Fed. R. App. P. 4(a)(4)(A)(iv). Any Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. *See* Fed. R. Civ. P. 60(c)(1). The time to file a Rule 60(b) motion cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only if the motion is filed within 28 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(4)(A)(vi).

**Dated:** April 17, 2018

          **ENTERED**

          _____
          **AMY J. ST. EVE**
          **United States District Court Judge**